Steven PONDER, Jr., Individually, and b/n/f, and Marsha Ponder, Individually, and a/n/f of Steven Ponder, Appellants,

v.

TEXARKANA MEMORIAL HOSPITAL, INC., d/b/a Wadley Regional Medical Center and Dr. Roy Deskin, Appellees.

No. A14–90–00088–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Nov. 27, 1991.

Rehearing Denied Jan. 23, 1992.

Rockne W. Onstad, Dan Fontaine, Grant Kaiser, Houston, for appellants.

Warren D. Hancock, Jr., Houston, Victor Hlavinka, Texarkana, Barbara Hilburn, Houston, for appellees.

Before MURPHY, DRAUGHN and CANNON, JJ.

## OPINION

DRAUGHN, Justice.

This appeal arises from a directed verdict on a portion of a negligence case and a take-nothing judgment rendered on the remainder. Because the trial court improperly directed a verdict and limited the testimony of a key expert witness at trial, we reverse and remand.

Steven Ponder, Jr. was born at Texarkana Memorial Hospital, d/b/a Wadley Regional Medical Center [Wadley]. Dr. Roy Deskin was Steven's pediatrician. The medical records show that he was normal at birth. However, because his mother was gestationally diabetic and insulin-dependent, Steven was at risk for developing hypoglycemia [low blood sugar] and hypocalcemia [low calcium]. Appellants contend that Steven's severe brain damage is a result of appellees' negligence during his stay at Wadley.

Appellants outlined the issues at trial as follows: Steven was born at risk for brain-damaging low calcium and blood sugar levels; he had both low calcium and blood sugar levels during the first forty-eight hours of his life; appellees were negligent in failing to properly assess, evaluate, and treat such low levels of calcium and blood sugar; the extremely low levels of blood sugar and calcium, acting alone or synergistically, caused severe and permanent brain damage; and when Steven was approximately two months old, Dr. Deskin negligently prescribed an overdose of dilantin that caused additional brain damage.

Appellees argued that Steven did not suffer either hypoglycemia or hypocalcemia during the early hours of his life. They suggested his brain damage resulted from other causes. Appellees argued, rather circularly, that since they never tested Steven's calcium level there could be no evidence that they were negligent in failing to test and treat him properly for hypocalcemia. Dr. Deskin conceded he was unaware that Steven was receiving the adult suspension of dilantin rather than a child's suspension when he significantly raised the prescribed dosage. In fact, he admitted that he did not even realize that both an adult and a child's suspension were available. He contended the resulting dilantin toxicity did not contribute to Steven's brain damage.

The trial court significantly limited the testimony of appellants' key causation expert. It granted motions directing verdicts for Wadley and Deskin on the hypocalcemia issues, and for Deskin on the dilantin toxicity issues. The remaining issues were submitted to the jury, which returned a take-nothing judgment.

Appellants contend the trial court erred in excluding the testimony of Dr. David Jensen concerning the cause of Steven's brain damage. Jensen has master's degrees in both physiology and biology. He received a doctorate in neuroscience from the Department of Neurosciences in the School of Medicine at the University of California, San Diego. Neuroscience is a multidisciplinary study of how the brain works: its anatomy, its living processes, its physiology, its chemistry and its structure. Jensen completed post-doctoral training at the University of California medical school.

Following work as a research neuroscientist at the University of California School of Medicine, Jensen joined the faculty of the Baylor College of Medicine where he conducted research and taught neurosciences and otolaryngology. Jensen taught basic courses in neuroscience, neurology, and sensory neurophysiology to medical students. He also taught advanced courses in neurophysiology, neuroanatomy, and neurochemistry to M.D.'s and Ph.D.'s. Jensen explained that a medical doctor specializes in making diagnoses and in treating patients, while a researcher like himself specializes in finding the causes of things.

This court is not presented with a question concerning Dr. Jensen's qualifications to testify as an expert. The trial court quite properly ruled that the predicate had been laid and that Dr. Jensen could testify as an expert. The question before us is whether the trial court abused its discretion by prohibiting Dr. Jensen from testifying concerning the cause of Steven's brain damage. Jensen testified before the jury that he had been asked by appellant's counsel "to find the cause, particularly, of an abnormal EEG reading and then to find the cause of the brain damage that Steven Ponder had." Jensen testified that he had "investigated the accuracy of using Dextrostix to measure the blood sugar in the neonate[, and had] investigated the causal relation between hypoglycemia and seizures, the relation between seizures and brain damage, the relation between hypoglycemia and brain, [and] the relation between hypoglycemia and hypocalcemia and seizures. They all interact in a complex way."

Despite its ruling that Jensen was qualified as an expert, the trial court sustained appellees' objections and instructed appellants' counsel not to ask Jensen questions concerning the standard of care or the cause of Steven's brain damage. Appellants' bill of exception reveals Jensen would have testified as follows: based on a reasonable scientific certainty, the cause of Steven's brain damage was a combination of hypoglycemia and seizures; that there was hypoglycemia in his brain shortly after birth that started subtle seizures at about one day of life; that, at that point, some structural change happened in the brain such that it made it more probable that the brain could go into more seizures more frequently; that Steven was at risk for hypocalcemia due to his mother's diabetes; that hypocalcemia would have made his brain cells more excitable than usual; and that low calcium levels could have been a potentiating[1] factor in his brain damage.

Since Jensen is not a medical doctor, and has never treated patients, we do not find that the trial court abused its discretion by preventing him from answering questions concerning the standard of care. However, Jensen should have been permitted to address causation. Non-physicians may qualify as medical experts by virtue of special experience. *Bilderback v. Priestley*, 709 S.W.2d 736, 741 (Tex.App.—San Antonio 1986, writ ref'd n.r.e.); *Johnson v. Hermann Hospital*, 659 S.W.2d 124, 126 (Tex.App.—Houston [14th Dist.] 1983, writ ref'd n.r.e.).

Jensens' experience clearly qualified him to testify about brain function and the causes of damage to the brain. His testimony would have provided "scientific, technical, or other specialized knowledge [that would have assisted] the trier of fact to understand the evidence or to determine a fact in issue." TEX.R.CIV.EVID. 702. Professionals such as Jensen are precisely the people responsible for teaching medical students and medical specialists. The other physician-experts more than likely acquired their knowledge of the area from a professional like Jensen. It would be nonsensical to permit physicians to testify about the causes of brain damage, yet prevent testimony by the very people who teach the physicians. While the trial court properly found Dr. Jensen was qualified to testify as an expert, it abused its discretion by prohibiting him from testifying on the causation of Steven's brain damage.

1. In lay terms, that means the low calcium level could have interacted with the low blood sugar in such a way as to create an effect much greater than if either condition existed alone.

■ Contrary to appellees' assertions, Jensen's testimony would not have been merely cumulative; he was the only expert on brain function and the causes of brain damage. Whether Steven developed hypoglycemia and seizures in the first few hours of his life, whether those factors were exacerbated by hypocalcemia, and whether his brain damage resulted from those conditions during his treatment at Wadley were hotly contested issues and critical to appellants' case. Additionally, though the jury was told that Jensen had been asked to find the cause of Steven's brain damage, he was never permitted to state the results of his study or to give his opinions on the matter. The jury could have inferred that Jensen was not asked questions concerning causation because his testimony would not have supported appellants' case. His testimony, if the jury had heard and believed it, could have provided crucial evidence concerning the time frame and causes of Steven's injuries. It was pivotal to the issue of liability.

■ The Texas Supreme Court has wisely recognized "the impossibility of prescribing a specific test for determining whether any error, be it the improper admission or exclusion of evidence, improper argument, or the giving of or depriving of [peremptory challenges], was calculated to cause and probably did cause the rendition of an improper judgment." *Lorusso v. Members Mutual Insurance*, 603 S.W.2d 818, 821 (Tex.1980). That determination is necessarily "a judgment call entrusted to the sound discretion and good sense of the reviewing court" and must be made "from an evaluation of the whole case." *First Employees Insurance Co. v. Skinner*, 646 S.W.2d 170, 172 (Tex.1983), *citing Lorusso*, 603 S.W.2d at 821. Each case must be analyzed to determine if the exclusion of evidence produced harm to the complainant. *Guentzel v. Toyota Motor Corp.*, 768 S.W.2d 890, 899–900 (Tex.App.—San Antonio 1989, writ denied); *Bohmfalk v. Linwood*, 742 S.W.2d 518, 522 (Tex.App.—Dallas 1987, no writ).

After reviewing the entire record, we find that, given the critical nature of Jensen's testimony concerning the time frame and cause of Steven's brain damage, and the importance of Jensen's testimony to appellants' case, the exclusion of that testimony was harmful, calculated to cause, and probably did cause the rendition of an improper judgment. Tex.R.App.P. 81(b). *See Guentzel*, 768 S.W.2d at 899–900; *Moore v. Polish Power, Inc.*, 720 S.W.2d 183, 193 (Tex.App.—Dallas 1986, writ ref'd n.r.e.); *Nix v. H.R. Management Co.*, 733 S.W.2d 573, 576–77 (Tex.App.—San Antonio 1987, writ ref'd n.r.e.); *Howard v. Faberge, Inc.*, 679 S.W.2d 644, 648 (Tex.App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.); *Johnson*, 659 S.W.2d at 127. Point of error four is sustained.

■ Appellants also alleged the trial court erred by granting appellees' motions for directed verdicts. In granting the motions, the trial court stated that it could not recall any causation testimony on the hypocalcemia and dilantin toxicity issues. When reviewing the grant of a directed verdict, we must view the evidence in the light most favorable to the party against whom the verdict was rendered, and disregard all contrary evidence and inferences. *Qantel Business Systems v. Custom Controls*, 761 S.W.2d 302, 303 (Tex.1988). If there is evidence about which reasonable minds could differ, the trial court's judgment must be reversed and the cause remanded for a new trial. *Henderson v. Traveler's Insurance*, 544 S.W.2d 649, 650 (Tex.1976). If an issue of fact is raised by the evidence, the case must go to the jury even though the court might set aside the verdict on the ground that it was not supported by sufficient evidence. *Lee v. Chumley Lumber*, 465 S.W.2d 414, 416–17 (Tex.Civ.App.—Houston [14th Dist.] 1971, writ ref'd n.r.e.).

A review of the record establishes that there was more than a scintilla of admitted evidence on the issues of hypocalcemia and dilantin toxicity. Dr. Jensen's excluded testimony was additional evidence on the hypocalcemia and dilantin toxicity issues that the proper trier of facts should have considered. Accordingly, these issues were

for a jury to decide. Points of error one, two and three are sustained.

Because of our disposition of appellants' points of error, it is unnecessary to address appellees' cross-points.

We reverse the judgment of the trial court and remand the cause for a new trial.